BON AIR HOTEL, INC., Plaintiff-Appellant,

v.

TIME, INC. and Dan Jenkins, Defendants-Appellees.

No. 27490.

United States Court of Appeals, Fifth Circuit.

May 6, 1970.

Jack D. Capers, Richard E. Allen, Augusta, Ga., for appellant.

Harold Medina, New York City, E. D. Fulcher, Augusta, Ga., for appellees.

Before RIVES, COLEMAN and MORGAN, Circuit Judges.

RIVES, Circuit Judge:

Bon Air appeals from the district court's order granting Time, Inc. and Dan Jenkins' (hereinafter referred to as Time) motion for summary judgment. Bon Air Hotel, Inc. v. Time, Inc., 295 F.Supp. 704 (S.D.Ga.1969).

Appellant, owner of the Bon Air Hotel in Augusta, Georgia, brought this libel action against Time for an article written by Jenkins and published in its magazine Sports Illustrated. Time's initial motion for summary judgment was denied by Judge Scarlett on December 20, 1967. On March 4, 1968, this Court denied Time's application for leave to appeal under 28 U.S.C.A. § 1292(b). Subsequently, the Supreme Court denied certiorari. 393 U.S. 859, 89 S.Ct. 131, 21 L.Ed.2d 127. Meanwhile Judge Scarlett had retired. Further proceedings were held before his successor, Judge Lawrence. On January 30, 1969, Judge Lawrence, pursuant to Rule 60(b), Fed.R. Civ.P., vacated Judge Scarlett's order and granted Time's motion for summary judgment.

Bon Air contends that the district court's order should be reversed on the grounds that: (1) The district court erred in applying the *New York Times* [1] rule to the publication in question; (2) the district court denied Bon Air due process of law in granting the motion for summary judgment without notice or opportunity for hearing; and (3) the district court erred in granting summary judgment.

The facts surrounding the publication will be mentioned only briefly since the district court's opinion sets forth the facts in detail. The April 6, 1964 issue of Sports Illustrated was devoted in large part to the Masters' Golf Tournament which is held each April in Augusta, Georgia. This issue included an article written by Jenkins, a well-known sports writer, who had visited Augusta during the week of the Tournament for fourteen years. The article described conditions under which the Tournament was held, accommodations available in Augusta for both players and spectators, and, in particular, conditions at the Bon Air Hotel. Examining the present condition of the hotel and past experiences of its guests during the week of the Tournament, Jenkins focused on the

"decline into dishevelment of the Bon Air Hotel though the general theme was Augusta and the Masters Tournament. According to the author, 100,-000 golf enthusiasts visit that city each year when it is played. Millions watch the event on television. For over twenty years prior to 1960 the Bon Air had been a landmark of the Masters scene. It was part and parcel of the Tournament. As the article says, 'The Bon Air was the place to be, and to be seen.' During the period 1961–1964 the hotel was closed for fifty-one weeks of each year and was opened only for the week of the Masters. The author had stayed at or visited the Bon Air for thirteen years and had observed first hand its alleged decline from the status of *grande dame* into the station of a dowdy, decrepit and disheveled old woman."

295 F.Supp. at 707.

### I. *New York Times Issue.*

The district court held the case was a proper one for application of the actual malice standard of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Bon Air contends this holding is erroneous in that (1) the *New York Times* rule applies only to defamation of "public officials" and "public figures" and (2) assuming that *New York Times* is applicable, the subject matter of the publication in question is not of sufficient public interest to warrant first amendment immunity. We conclude that both contentions are without merit.

In *New York Times* the Supreme Court held that the first amendment limits a state's power to award damages in a libel action brought by a public official against critics of his official conduct. The rationale of the decision was that in the area of free debate, where exaggeration and misstatement are inevitable, freedom of expression must have the breathing space it needs to survive re-

---

1. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

gardless of "the truth, popularity, or social utility" of the statements. 376 U.S. at 271, 84 S.Ct. at 721. However, the Court conditioned the first amendment protection on a lack of actual malice, i. e., knowledge that a statement is false or reckless disregard of whether or not it is false. In Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Court extended the first amendment guarantees to misstatement of fact in discussing public figures.

The question before us is whether the first amendment protection, extended to public officials in *New York Times* and to public figures in *Butts*, applies to publication concerning matters of public interest. In decisions since *New York Times*, the Court has continued to emphasize that freedom of expression upon public questions is secured by the first amendment.[2] This Court in Time, Inc. v. McLaney, 406 F.2d 565 (5 Cir.), cert. den., 395 U.S. 922, 89 S.Ct. 1776, 23 L. Ed.2d 239 (1969), noted that the New York Times actual malice standard is applicable to publications involving matters of great public interest.[3]

Since the Butts decision, which extended first amendment protection to public figures, numerous lower courts have extended application of the actual malice standard to publications possessing a valid public interest.[4] We agree with these decisions that publications concerning matters of public interest are protected by the first amendment absent proof of actual malice.

2. *See* Garrison v. Louisiana, 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Rosenblatt v. Baer, 383 U.S. 75, 86, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); Curtis Publishing Co. v. Butts, *supra*, 388 U.S. at 150–152, 87 S.Ct. 1975; Pickering v. Board of Education, etc., 391 U.S. 563, 573–574, 88 S.Ct. 1731, 20 L. Ed. 811 (1968). In *Butts*, Justice Harlan (announcing the judgment of the Court) relied on a phrase from Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), that freedom of discussion " 'must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' " 388 U.S. at 147, 87 S.Ct. at 1987. In Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), the Court denied recovery in an action brought under New York's right of privacy statute. Relying on *New York Times*, the Court held that "the constitutional protections for speech and press preclude the application of the New York statute to redress false reports of matters of public interest in the absence of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth." *Id.* at 387–388, 87 S.Ct. at 542.

3. The Court in *McLaney* predicated its application of the *New York Times* standard on McLaney's active participation in matters of important public concern. McLaney, Like General Walker in Curtis Publishing Co. v. Butts, *supra*, had thrust his personality into the "vortex" of an important public controversy. The Court, however, did not attempt to limit *New York Times* to public officials and public figures, but agreed with the Ninth Circuit's decision in United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc., 404 F.2d 706 (9 Cir. 1968), which applied the actual malice standard to matters of legitimate public interest.

4. Wasserman v. Time, Inc., 424 F.2d 920 (D.C.Cir.1970); Rosenbloom v. Metromedia, Inc., 415 F.2d 892 (3 Cir. 1969); United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc., 404 F.2d 706 (9 Cir. 1968); Holmes v. Curtis Publishing Co., 303 F.Supp. 522 (D.S.C. 1969); Cerrito v. Time, Inc., 302 F.Supp. 1071 (N.D.Cal.1969); Ragano v. Time, Inc., 302 F.Supp. 1005 (M.D.Fla.1969); Arizona Biochemical Co. v. Hearst Corp., 302 F.Supp. 412 (S.D.N.Y.1969); De Salvo v. Twentieth Century-Fox Corp., 300 F.Supp. 742 (D.Mass.1969); Sellers v. Time, Inc., 299 F.Supp. 582 (E.D.Pa. 1969); Altoona Clay Products, Inc. v. Dun & Bradstreet, Inc., 286 F.Supp. 899 (W.D.Pa.1968); Cullen v. Grove Press, Inc., 276 F.Supp. 727 (S.D.N.Y.1967); All Diet Food Distributors, Inc. v. Time, Inc., 56 Misc.2d 821, 290 N.Y.S.2d 445 (1967); *see* Time, Inc. v. McLaney, 406 F.2d 565 (5 Cir. 1969). *See also* Curtis Publishing Co. v. Butts, 351 F.2d 702, 721–722 (5 Cir. 1965) (Rives, J., dissenting).

862

Bon Air also contends that, if the *New York Times* actual malice standard applies to publications discussing matters of public interest, the article in Sports Illustrated is not of sufficient public interest to warrant first amendment immunity. In particular, Bon Air argues that the Masters' Golf Tournament does not make an inconspicuous and little-known hotel a matter of such public interest.

█ In rejecting this contention, the district court found that the national interest in the particular event and the interest of 100,000 golf enthusiasts in the accommodations in Augusta during the Masters' Tournament constituted a valid public interest. We agree. Although some "public interest" cases have dealt with matters of a more critical nature, e.g., public health[5] and organized crime,[6] we conclude that Time's article, focusing on Augusta, the Masters' Golf Tournament and the public accommodations available for the many thousands of spectators, was of a legitimate public interest.[7] For these reasons, the district court did not err in applying the *New York Times* actual malice standard to the publication in question.

## II. *Denial of Due Process.*

Bon Air next contends that it was denied due process of law when the district court granted Time's motion for summary judgment without notice or opportunity to develop a case by oral argument or by presentation of evidence.

The district court on January 20, 1969, wrote counsel and inquired whether the court had the power, and if so whether it should be exercised under the circumstances, to vacate the court's previous denial of Time's motion for summary judgment. Counsel for Time replied that the court did have the power to vacate and suggested that his letter be treated as a motion for reconsideration of Time's earlier motion for summary judgment. On January 23 the court notified counsel that it was treating the letter as a motion to vacate the earlier order denying summary judgment and also as a motion to reopen Time's earlier motion for summary judgment. Counsel for Bon Air, in replying to the court on January 27, 1969, conceded that the court had the power to vacate the earlier order denying summary judgment but urged the court not to exercise that power. On January 30, 1969,[8] the court granted Time's motion for summary judgment.

█ The district court's denial of Time's motion for summary judgment on December 20, 1967, was only an interlocutory order and thus not subject to being vacated under Rule 60(b), Fed.R. Civ.P.[9] However, because the order was interlocutory, "the court at any time before final decree [could] modify or rescind it." John Simmons Co. v. Grier Brothers Co., 258 U.S. 82, 88, 42 S.Ct. 196, 198, 66 L.Ed. 475 (1922); see Carter v. American Bus Lines, Inc., 22 F.R.D. 323, 325 (D.Neb.1958); Kliaguine v. Jerome, supra. Thus, vacating the earlier order was within the district court's power, and we do not find that the court abused its discretion. *See* Marconi Wireless Telegraph Co. v. United States, 320 U.S. 1, 47–48, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943).

5. United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc., *supra.*

6. Wasserman v. Time, Inc., *supra*; Cerrito v. Time, Inc., *supra*; Ragano v. Time, Inc., *supra*; Time, Inc. v. McLaney, *supra.*

7. See Rosenbloom v. Metromedia, Inc., *supra* (obscene literature); Sellers v. Time, Inc., *supra* (freak accident on golf course and resulting action for damages); Altoona Clay Products, Inc. v. Dun & Bradstreet, Inc., *supra* (credit information).

8. Although the order is dated January 29, 1969, it was filed with the clerk on January 30.

9. Kliaguine v. Jerome, 91 F.Supp. 809, 810 (E.D.N.Y.1950); see 6 Moore Federal Practice §§ 56.14[2], 60.20 (2d ed. 1966).

Rule 56(c), Fed.R.Civ.P., provides that the "motion [for summary judgment] shall be served at least 10 days before the time fixed for the hearing." This Court has interpreted Rule 56(c) as requiring notice to the adverse party and a hearing.[10]

■ We are of the opinion that both of these requirements were complied with in the district court. Through the district judge's letter to counsel on January 20, 1969, and the court's notification on January 23, 1969, Bon Air received sufficient notice that the district court was reconsidering Time's motion for summary judgment.

The following factors are relevant in our consideration of the question of whether Bon Air was allowed to be heard on the summary judgment motion: (1) Oral argument was conducted on Time's original motion for summary judgment, which was denied; (2) Bon Air filed briefs in opposition to Time's petition in this Court for leave to appeal the denial of its motion and also in opposition to Time's petition for rehearing of this Court's denial of the above petition; (3) affidavits and interrogatories with Time and Dan Jenkins' answers thereto were filed with the district court by Bon Air; (4) on January 27, Bon Air submitted a letter to the district court, together with a pretrial brief, and urged that the district court should not vacate its earlier denial of Time's summary judgment motion, for the principal reason that the case should proceed to trial and should not be disposed of through summary judgment. The combination of these

factors convinces us that Bon Air was "heard," within the meaning of Rule 56(c), on the reconsideration of Time's motion for summary judgment. The fact that an oral hearing was not held on the court's reconsideration of Time's motion does not amount to noncompliance with Rule 56(c) or a denial of due process.[11]

### III. *Summary Judgment.*

■ Having concluded that *New York Times'* actual malice standard was applicable to the publication in question, the district court examined the record and granted Time's motion for summary judgment. The court held the record "devoid of any showing that defamatory statements were published by defendant Time * * * with knowledge of their falsity or with a reckless disregard of whether they were true or false." 295 F.Supp. at 709. We agree with the district court that the record was totally devoid of facts from which Bon Air could prove that statements were made by Time and Jenkins with actual malice, and proceed to state our views at some length.

The Supreme Court in *New York Times* conditioned the first amendment privilege to make misstatement of facts on the absence of a publisher's actual malice, *i.e.*, with actual knowledge of a statement's falsity or with reckless disregard of its falsity. 376 U.S. at 279–280, 84 S.Ct. 710. In Garrison v. Louisiana, *supra*, 379 U.S. at 74, 85 S.Ct. at 216, "reckless disregard" is defined as "high degree of awareness of their probable falsity," and in St. Amant v. Thomp-

---

10. Georgia Southern & Fla. Ry. Co. v. Atlantic Coast Line R. R. Co., 373 F.2d 493, 496–497 (5 Cir. 1967) ; Enochs v. Sisson, 301 F.2d 125, 126 (5 Cir. 1962). See also Bowdidge v. Lehman, 252 F.2d 366 (6 Cir. 1958).

11. *See* Hilton v. W. T. Grant & Co., 212 F.Supp. 126, 128–129 (W.D.Pa.1962). *See also* Federal Communications Comm. v. WJR, the Goodwill Station, Inc., 337 U.S. 265, 274–277, 69 S.Ct. 1097, 93 L. Ed. 1353 (1949). Another consideration is Bon Air's inaction. Because this was

a reconsideration of Time's earlier motion for summary judgment, it seems to us that Bon Air should have presented any additional evidence through affidavits or otherwise under Rule 56(e), Fed.R.Civ.P., and if time had not permitted it to do so, should have requested the district court to reconsider its order granting summary judgment. In the absence of some such action on Bon Air's part, we are left to mere speculation as to whether any additional evidence was available to Bon Air.

son, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), as "serious doubts as to the truth." [12] In addition, the Court placed a heavy burden of proof on plaintiffs—actual malice must be proved with "convincing clarity." [13]

■■■ Actual malice is a constitutional issue to be decided initially by the trial judge vis-à-vis motions for summary judgment and directed verdict. The functions of the trial court judge and the jury have been explained as follows:

"In my judgment New York Times Co. v. Sullivan makes actual malice a constitutional issue to be decided in the first instance by the trial judge applying the *Times* test of actual knowledge or reckless disregard of the truth. Cf. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Unless the court finds, on the basis of pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice in the *Times* sense, it should grant summary judgment for the defendant. * * *

"If the case survives the defendant's summary judgment motion, the trial court at the close of the plaintiff's case must decide whether actual malice has been shown with 'convincing clarity.' In making this judgment the court will judge the credibility of the witnesses and draw its own inferences from the evidence. If the trial is permitted to proceed, the court will be called upon again to make a judgment on the actual malice issue at the close of all of the evidence. If the motion for a directed verdict at this stage of the trial is denied, the actual malice issue, along with the other issues, is then submitted to the jury under the *Times* instruction without any indication from the court or counsel that the court has decided that the evidence shows actual malice with 'convincing clarity.'" [Citations and footnotes omitted.]

Wasserman v. Time, Inc., 424 F.2d 920, p. 922 (D.C.Cir.1970) (Wright, J., concurring) Such a two-step procedure "provides the protection of the First Amendment freedom that *Times* sought to make secure in areas of public concern" *Id.* at 923. *Compare* Rosenblatt v. Baer, 383 U.S. 75, 88 n. 15, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).

■■■ Thus it is clear that, where a publication is protected by the *New York*

---

12. In its most complete statement on the "reckless disregard" element of actual malice, the Court in *St. Amant* explained:

"'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law. Our cases, however, have furnished meaningful guidance for the further definition of a reckless publication. In *New York Times, supra,* the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information. In Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), also decided before the decision of the Louisiana Supreme Court in this case, the opinion emphasized the necessity for a showing that a false publication was made with a 'high degree of awareness of * * * probable falsity.' * * * These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. *There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the the truth of his publication.* Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."

390 U.S. at 730, 731, 88 S.Ct. at 1325 [emphasis added].

13. New York Times Co. v. Sullivan, *supra,* 376 U.S. at 285–286, 84 S.Ct. 710; *see* Cepeda v. Cowles Magazines & Broadcasting, Inc., 392 F.2d 417 (9 Cir. 1968); Ragano v. Time, Inc., 302 F.Supp. 1005, 1010 (M.D.Fla.1969).

*Times* immunity rule, summary judgment, rather than trial on the merits, is a proper vehicle for affording constitutional protection in the proper case. Judge Tuttle in Time, Inc. v. McLaney, *supra*, 406 F.2d at 566, recognized the appropriateness of summary judgment:

> "The subject matter of this litigation, involving, as it does, the very serious and timely question of how far the First Amendment guarantee of freedom of the press may still be impinged upon by actions for libel, places some cases in a somewhat different category. This follows when the trial court and this court jointly consider that the failure to dismiss a libel suit might necessitate long and expensive trial proceedings, which, if not really warranted, would themselves offend the principles enunciated in Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22, because of the chilling effect of such litigation."

The District of Columbia Circuit placed a similar emphasis on the role of summary judgments in defamation actions:

> "In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. * * * Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors. And to this extent debate on public issues * * * will become less uninhibited, less robust, and less wide-open, for self censorship affecting the whole public is 'hardly less virulent for being privately administered.' Smith v. People of State of California, 361 U.S. 147, 154, 80 S.Ct. 215, 219, 4 L.Ed. 2d 205 (1959)."

Washington Post Co. v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965, 968 (1966).

Numerous courts have found summary judgment for publishers proper where the record is devoid of genuine issues of fact as to whether the alleged defamatory statement was published with actual knowledge of its falsity or with a reckless disregard of whether it was true or false.[14] Other courts, however, have not allowed a publisher's motion for summary judgment where facts were presented from which a jury could find that a statement was made with actual malice.[15]

We thus proceed to an examination of the record, viewing it and the inferences which might be drawn therefrom in the light most favorable to Bon Air,[16] to ascertain whether "the record established by [Bon Air] demonstrate[s] that there is no issue of fact from which a jury could find 'actual malice.'" Time, Inc.

14. Time, Inc. v. McLaney, 406 F.2d 565 (5 Cir.), cert. den., 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969); United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc., 404 F.2d 706 (9 Cir. 1968), cert. den., 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); Hurley v. Northwest Publications, Inc., 398 F.2d 346 (8 Cir. 1968), aff'g 273 F.Supp. 967 (D.Minn.1967); Walker v. Pulitzer Publishing Co., 394 F.2d 800 (8 Cir. 1968); Thompson v. Evening Star Newspaper Co., 129 U.S. App.D.C. 299, 394 F.2d 774 (1968); Washington Post Co. v. Keogh, 125 U.S. App.D.C. 32, 365 F.2d 965 (1966), cert. den., 385 U.S. 1011, 87 S.Ct. 708, 17 L. Ed.2d 548 (1967); Cerrito v. Time, Inc., 302 F.Supp. 1071 (N.D.Cal.1969); Sellers v. Time, Inc., 299 F.Supp. 582 (E.D.Pa.1969), aff'd, 423 F.2d 887 (3 Cir., 1970).

15. Wasserman v. Time, Inc., 424 F.2d 920 (D.C.Cir., 1970); Goldwater v. Ginzburg, 414 F.2d 324 (2 Cir. 1969), aff'g 261 F. Supp. 784 (S.D.N.Y.1966); Ragane v. Time, Inc., 302 F.Supp. 1005 (M.D.Fla. 1969), appeal filed (5 Cir.); cf. Pape v. Time, Inc., 419 F.2d 980 (7 Cir. 1969), rev'g 294 F.Supp. 1087 (N.D.Ill. 1969) (evidence of actual malice sufficient to go to jury); Stearn v. MacLean-Hunter, Ltd., 46 F.R.D. 76 (S.D.N.Y. 1969) (complaint sufficient to state cause of action).

16. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Goldwater v. Ginzburg, *supra*, 414 F.2d at 337; Time, Inc. v. McLaney, *supra*, 406 F.2d, at 571–572.

v. McLaney, *supra*, 406 F.2d at 567; see Rule 56(c), Fed.R.Civ.P.

The complaint alleged that the article as a whole was defamatory and that ten specific statements in the article were false and libeled Bon Air: (1) The hotel has a "whitewashed face"; (2) the hotel is staffed with ancient waiters in white coats who "tumble drowsily through the dining room"; (3) the hotel management's attitude toward its guests is that of "stay-at-your-own-risk"; (4) the hotel is being gradually converted into a "residence for the elderly"; (5) halls "sloped awkwardly" toward the rooms; (6) rooms are "wide enough so that by turning sideways a guest can walk between the bed and the dresser"; (7) "Windows are of two types. If, upon entry, a window is up it is not likely ever to come down, especially if the evening is brisk. On the other hand, if the window is down, it will never go up"; (8) tubs and basins were never "worth much"; (9) sleeping accommodations are described: "Sleeping at the Bon Air has long been difficult for reasons other than the heat or the cold or the hardness of the beds. It is noisy. Not the least amount of noise sometimes is caused by the clacking of highheeled shoes going down the fire escape outside a guest's window at 4 a.m."; and (10) the hotel has a "sell-out crowd" for the week of April 6 through April 12, 1964. Bon Air also objected to a drawing of the hotel at the beginning of the article.

Jenkins in writing the article relied on interviews with persons who had stayed at the Bon Air, researched the files of Time, Inc. with respect to Augusta and its background, and drew upon his thirteen years' attendance at the Tournament in Augusta and also upon the occasions when he was a registered guest or visitor at the hotel. After the article was completed and a month before its publication, a Sports Illustrated researcher, Sarah Pileggi, checked the article for accuracy by telephone conversations, by personal interviews, by consulting Time, Inc. files and by reading relevant published sources on golf tournaments and Augusta. Pileggi also sent a list of questions concerning specified statements in the article to Sports Illustrated's Atlanta correspondent, Jim Minter, who with assistance from an Augusta newspaperwoman checked the accuracy of these items. Detailed answers were returned and are included in the affidavits.

The district court examined the article and, in particular, the ten alleged defamatory statements in light of the various affidavits and answers to interrogatories in the record and found "that no proof was adduced that had 'the convincing clarity which the constitutional standard demands.'" This finding is clearly supported by the record. Jenkins relied on his own experiences at the Bon Air in making many of the statements and, in addition, had the article thoroughly investigated for accuracy by members of Time's research staff. The affidavits and answers to interrogatories in the record demonstrate the thoroughness of the research conducted by Time's staff. Bon Air presented no evidence that Time or Jenkins published the statements with knowledge of their falsity or with "serious doubts as to the truth of [the] publication." St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); Time, Inc. v. McLaney, *supra*, 406 F.2d at 572–573.

Two alleged defamatory statements merit further discussion: (1) the statement that the hotel had a "whitewashed face" and (2) the sketch of the hotel at the beginning of the article. In investigating the accuracy of the article, Time's researchers gave three different answers: that the hotel was a white-yellowish color, that it was painted outside white, and that it was painted a dazzling white.

At the beginning of the article Time published a sketch of the hotel and surrounding grounds by Marc Simont, who had visited the hotel several times during the preparation of the sketch. Bon Air objected to two areas of the sketch:

at the far end of the hotel three wooden braces support the outer hotel wall, and near the swimming pool a small amount of trash covers the ground. The researcher's report stated that during her inspection of the hotel the grounds were clean. In addition, Time admitted that the hotel walls were not supported by wooden braces.

These statements are clearly not 100% accurate. Truth or falsity, however, is not the constitutional test; the statements must be published with actual knowledge of their falsity or with reckless disregard for their falsity. We are not convinced that Time's decision to describe the hotel as having a "whitewashed face," instead of a "white-yellowish face," an "outside white face," or a "dazzling white face," is evidence that the statement was published with actual malice.[17] In publishing the sketch of the hotel, as explained in its affidavits, Time attempted to convey to its readers, in what amounts to a cartoon, the condition of the hotel as described in the article.[18] Again, the evidence presented by Bon Air is not sufficient proof that the sketch was published by Time with actual malice.[19]

Freedom of expression must have a necessary breathing space if it is to survive.[20] If these statements raise factual issues of actual malice, that necessary breathing space becomes almost meaningless. As has been noted, actual malice is a constitutional issue to be determined initially by the trial judge on motion for summary judgment. We are convinced that Bon Air has not presented issues of fact from which a jury could find that Time published the article with actual knowledge of its falsity or with a reckless disregard as to whether or not it was false.[21]

For these reasons we conclude that the district court did not err in granting Time's motion for summary judgment. The judgment is

Affirmed.

17. "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." Towne v. Eisner, 1918, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372.

18. We would be confronted with an entirely different situation if a true photograph of the hotel had been used with additional pictures of wooden braces and trash superimposed on the photograph.

19. The decisions in Wasserman v. Time, Inc., 424 F.2d 920 (D.C.Cir., 1970), and Ragano v. Time, Inc., 302 F.Supp. 1005 (M.D.Fla.1969), are distinguishable. Wasserman involved the same factual situation as Ragano. Time had published a photograph of seven men sitting in a restaurant in Queens, New York. The article referred to the men as "top Cosa Nostra hoodlums," even though Time *knew* that Wasserman and Ragano were present with the other five men only in an attorney-client relationship. This was sufficient proof of actual malice to survive Time's motion for summary judgment.

20. New York Times Co. v. Sullivan, *supra*, 376 U.S. at 285–286, 84 S.Ct. 710.

21. The following statement by Judge Tuttle in *McLaney* seems pertinent here:
"Where * * * it is plain that the record has been fully developed by depositions and affidavits on a motion for summary judgment, and such record demonstrates that, construing all of the facts and inferences to be drawn therefrom in favor of the party against whom the judgment is entered, he would not be entitled to have a jury verdict stand, we have not hesitated to hold that the grant of summary judgment is proper." 406 F.2d at 571–572.